# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| TAMMY MARIE PALACIO, | ) | CASE NO. 3:13CV967 |
| | ) | |
| **Plaintiff,** | ) | **JUDGE JACK ZOUHARY** |
| **v.** | ) | **Magistrate Judge George J. Limbert** |
| | ) | |
| CAROLYN W. COLVIN, | ) | <u>Report and Recommendation of</u> |
| COMMISSIONER OF | ) | <u>Magistrate Judge</u> |
| SOCIAL SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

Tammy M. Palacio ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court REVERSE the Commissioner's decision and REMAND the instant case to the ALJ:

## I.    PROCEDURAL AND FACTUAL HISTORY

On June 2, 2009, Plaintiff filed her most recent application for SSI, alleging disability beginning February 6, 2002. ECF Dkt. #13 at 170[1]. Plaintiff's prior application for SSI was filed on February 6, 2002 and the ALJ who held a hearing on Plaintiff's claim in that case found on January 19, 2005 that Plaintiff was not under a disability at any time from February 6, 2002 through the date of his decision and therefore not entitled to SSI. *Id.* at 99. Plaintiff did not appeal that determination.

The SSA denied Plaintiff's most recent application initially and on reconsideration. ECF Dkt. #13 at 103-104, 110-120. Plaintiff filed a request for an administrative hearing and on March 10, 2011, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel. *Id.* at 44, 126. At the hearing, the ALJ heard testimony from Plaintiff and a vocational expert ("VE").

---

[1]Page numbers refer to "Page ID" numbers in the electronic filing system.

*Id.* at 44.  On September 8, 2011, the ALJ issued a decision denying Plaintiff benefits.  *Id.* at 18-38. Plaintiff filed a request for review of the decision and on February 25, 2013, the Appeals Council denied the request for review.  *Id.* at 1-14.

On April 29, 2013, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  On August 15, 2013, Plaintiff filed a brief on the merits.  ECF Dkt. #14. Defendant filed a brief on the merits on September 27, 2013, and Plaintiff filed a reply on October 25, 2013.  ECF Dkt. #s 16, 18.

## II.      RELEVANT MEDICAL EVIDENCE

On July 4, 2004, family members brought Plaintiff to the emergency room after she fell in her yard two hours prior and got her leg tangled in a rope and crawled to her house to get help.  ECF Dkt. #13 at 270, 311.  Plaintiff stated that she had a 20 ounce can of beer.  *Id.*  A medical history of mitral valve prolapse and hypertension were noted.  *Id.*  She was diagnosed with a fracture of the distal third of the tibia and proximal left lower leg.  *Id.* at 312.  She was given crutches, told to elevate her leg and ice it and given Percocet until she could be evaluated by an orthopedic surgeon. *Id.* at 287.

On July 5, 2004, Plaintiff returned to the emergency room indicating that she could not take the Percocet prescribed to her because it made her nauseous.  ECF Dkt. #13 at 303.  She requested additional pain medications.  *Id.*  She was given Toradol and Darvocet, but the Darvocet was subsequently canceled after the pharmacy called and expressed concern that Plaintiff was receiving too much medication because she was prescribed Percocet the day prior and was prescribed Toradol and Darvocet.  *Id.* at 304.  The emergency room doctor noted the pharmacy call and diagnosed Plaintiff with a lower leg fracture and drug-seeking behavior.  *Id.*

On July 16, 2004, Plaintiff was admitted to the hospital and underwent an open reduction and internal fixation of the tibia using an intramedullary rod.  *Id.* at 271.

On November 8, 2005, Plaintiff underwent an x-ray of her right elbow for complaints of pain over the last two months.  ECF Dkt. #13 at 332.  The results were normal.  *Id.*

On May 22, 2006, Dr. Goyal of Ambulatory Services met with Plaintiff to establish a new primary doctor.  ECF Dkt. #13 at 413.  Plaintiff complained of no headache, chest pain or shortness

of breath, but she did not complain of low back pain for which she had been treating with Percocet for awhile. *Id*. She also indicated that she took Xanax for anxiety. *Id*. Upon examination, Dr. Goyal found that Plaintiff had normal sensation and motor function in all four extremities, no leg edema, positive pulses and reflexes and a normal straight leg raising test. *Id*. at 414. He diagnosed Plaintiff with hypertension, COPD and bronchitis, low back pain and anxiety. *Id*. He recommended that she continue her medications, including Albuterol and Percocet that he prescribed for her, quit smoking, follow up at the pain clinic and see a psychiatrist. *Id*.

On September 5, 2006, Plaintiff met with Dr. Hejeebu, an internist at at the University of Toledo Medical Center for her complaints of chronic neck and back pain with tingling and numbness in the left leg. ECF Dkt. #13 at 411. Upon examination, Dr. Hejeebu found that Plaintiff had normal extremity sensation and motor functions, no leg edema, and back pain starting at L4-S2, but no radiation and normal straight leg raising test. *Id*. at 412. He ordered an x-ray of Plaintiff's left leg and a MRI of the lumbosacral spine, referred Plaintiff to the pain clinic, ordered blood work and added Lyrica to Plaintiff's medication regimen. *Id*.

On November 29, 2006, Plaintiff presented for a pain management consultation with Dr. Tamirisa of St. Charles Mercy Hospital due to her intermittent low back pain for the last 10 years. ECF Dkt. #13 at 356. Plaintiff explained that her low back pain had gotten worse over the prior two months and the pain radiated down her left hip and leg to her ankle. *Id*. She also complained of right calf pain and left leg numbness and tingling. *Id*. Plaintiff's prior treatment was noted, which included aquatics in 1999 after a fractured right leg and physical therapy after her left leg fracture in 2005. *Id*. Plaintiff indicated that she had tried Vicodin and Darvocet in the past and Tylenol #3 but it made her sick. *Id*. She stated that she took her last dose of Percocet the day prior and had her last dose of Xanax two weeks ago. *Id*.

Plaintiff described her pain as  moderate to severe and aggravated by standing, climbing, steps, pushing, pulling, walking, bending forward and twisting. ECF Dkt. #13 at 356. She noted that she had decreased energy, mood changes, depression, anxiety, loss of motivation and difficulty concentrating. *Id*. Her prior medical history included mitral valve prolapse, anxiety, depression, COPD, hypertension, arthritis and chronic back pain. *Id*. Plaintiff explained that she smoked one

pack of cigarettes per day and has an occasional beer. *Id.* She indicated that she was divorced with four children and she watched her grandchildren five days per week. *Id*.

Physical examination revealed clear lung sounds, intact sensation, decreased sensation to the left knee area, an antalgic gait, positive straight leg raising on the left, tenderness on palpation of the lower lumbar paraspinal muscles and pain with forward flexion of the lumbar spine, but normal movement of the hips, knees and ankles, and normal motor strength in all muscle groups. ECF Dkt. #13 at 357. An October 19, 2006 MRI of the lumbar spine showed a left paramidline disc herniation at L3-L4 impinging on the left L4 nerve root, a right paramidline and foraminal disc herniation at L4-L5 resulting in moderate narrowing of the right neural foramina, and a left paramidline disc herniation at L5-S1 impinging on the left S1 nerve root resulting in moderate narrowing of the left neural foramen with impingement on the left L5nerve root and the neural foramen. *Id.* Dr. Tamirisa recommended lumbar epidural steroid injections, physical therapy and aquatics. *Id*.

On December 5, 2006, Plaintiff had a general check up for her back pain. ECF Dkt. #13 at 410. Plaintiff complained of low back pain with left thigh radiation and mild tingling on the left side. *Id.* Dr. Hejeebu found no edema upon examination, normal lower extremity strength and sensation, and the ability to toe and heel walk. *Id.* Plaintiff was referred to the Neurosurgery Clinic to discuss the MRI report, referred for a DEXA scan, was advised to quit smoking, and was given a refill of Xanax as requested. *Id*.

On January 1, 2007, Plaintiff followed up with Dr. Taleb, still complaining of low back pain with radiation to her left lower extremity with weakness and numbness. ECF Dkt. #13 at 408. Upon examination, Plaintiff had normal power and sensation in both feet, but had positive straight leg raising on the left and mild tenderness in the lumbosacral area. *Id*. at 409.

On February 7, 2007, Dr. Abumeri of the Neurosurgery Clinic wrote Dr. Mutgi a letter indicating that he examined Plaintiff for her chronic low back pain and left lower extremity radiculopathy. ECF Dkt. #13 at 406. Upon physical examination, Dr. Abumeria found that Plaintiff was able to heel and toe walk and her gait was normal. *Id*. at 407. Her upper and lower extremity strength was normal, but she had slight decreased sensation to the postero-lateral aspect of the calf to pinprick and light touch. *Id*. He found straight leg raising to be negative, particularly on the left.

*Id.* Dr. Abumeri recommended a conservative approach to treatment, including physical therapy and referral to a pain clinic. *Id.* He also recommended an EMG and nerve conduction velocity study. *Id.* He noted that the conservative approach failed, she may benefit from a microdiskectomy although she was not a candidate for bone fusion because she was a chronic smoker. *Id.*

On February 12, 2007, Plaintiff followed up with Dr. Goyal. ECF Dkt. #13 at 374. Dr. Goyal noted Plaintiff's MRI results showing a herniated disc pressing on the L4-L5 root and her complaints of back pain with radiation to her left lower extremity and numbness. *Id.* He noted that Dr. Abumeri recommended that Plaintiff be treated in the pain clinic and with physical therapy. *Id.* Plaintiff's past medical history indicated hypertension, mitral valve prolapse, COPD, depression and anxiety. *Id.* Upon examination, Plaintiff had clear breath sounds and positive pulse and no edema in her lower limbs, but mild tenderness at L4-L5 and L5-S1. *Id.* at 375. Dr. Goyal referred Plaintiff for a functional capacity assessment for her low back pain, and noted that Plaintiff's hypertension and COPD were well-controlled on medications. *Id.*

On May 7, 2007, Plaintiff followed up with Dr. Goyal concerning her back pain. ECF Dkt. #13 at 372, 402. Plaintiff complained of low back pain with radiation to her left lower extremity and numbness in her foot, with incontinence when she coughed. *Id.* It was noted that Plaintiff had shortness of breath from COPD that was stable for a long period of time and she was taking Albuterol as needed. *Id.* Upon examination, Dr. Goyal indicated that Plaintiff's memory and attention were excellent, her gait was regular, she was able to stand on her tiptoes and heels, she had normal motor strength and negative straight leg raising, but she had slight decreased sensation to the posterolateral aspect of the calf to pinprick and light touch and she had mild tenderness on the lower lumbar area with limited flexon. *Id.* at 373. On the basis of the examination and Plaintiff's MRI results, Dr. Goyal agreed with the recommended conservative treatment and recommended an EMG and nerve conduction velocity study. *Id.* Dr. Goyal noted that if the conservative approach failed, Plaintiff may benefit from a microdiskectomy, but she was not a candidate for bone fusion because she was a chronic smoker. *Id.* He also found that Plaintiff's COPD was well-controlled on Albuterol and her hypertension was noted to be on the high side, so her Lisinopril was increased. *Id.*

On August 13, 2007, Plaintiff followed up with Dr. Lynn concerning her low back pain. ECF Dkt. #13 at 400. It was noted that doctors refused to do back surgery because Plaintiff had COPD and refused to stop smoking. *Id.* She rated 3 out of 10 on the pain scale and she had numbness in her right lower extremity. *Id.* Straight leg raising test was negative upon examination and Plaintiff had mild tenderness over the lower lumbar vertebrae. *Id.* at 401. Plaintiff was prescribed more Percocet and referred to physical therapy. *Id.* She was also given two weeks of medication for her depression and advised that if she needed more in the future, her psychiatrist should refill it. *Id.* Plaintiff's blood pressure was higher at this visit and she was kept on this medication, as well as her COPD medication. *Id.*

On September 21, 2007, Occupational Therapist Lynne Chapman conducted an occupational therapy evaluation of Plaintiff for Dr. Taleb. ECF Dkt. #13 at 398. Ms. Chapman concluded that Plaintiff was capable of performing light level for an eight hours per day. *Id.* Plaintiff demonstrated the abilities to lift 28 pounds occasionally from floor to waist, 13 pounds occasionally from waist to eye level, 23 pounds with two hands occasionally, 15 pounds with one hand occasionally, push/pull 30 pounds occasionally, and she could sit frequently, stand, walk and climb stairs occasionally, and she could never kneel, squat, work with her arms overhead, repetitively lift from floor to waist, climb a ladder, or crawl. *Id.* at 399. Ms. Chapman based the underlying limitations on her complaints of low back pain and left leg pain. *Id.*

On November 19, 2007, Plaintiff followed up with Dr. Goyal. ECF Dkt. #13 at 396. She rated her back pain as an 8 of 10 and stated that physical therapy did not help. *Id.* It was noted that Plaintiff was receiving a refill of Percocet for 120 tablets per month. *Id.* It was also noted that Plaintiff's depression medication was stopped until she saw a psychiatrist, but Plaintiff did not go to see a psychiatrist "because she does not want to be seen by many residents in the Psychiatric Clinic." *Id.* Physical examination showed positive straight leg raising on the left side and mild tenderness over the upper sacral vertebrae. *Id.* at 397. She was assessed with chronic low back pain due to herniated disc disease, hypertension, shortness of breath, mitral valve prolapse and history of depression. *Id.*

On December 14, 2007, Plaintiff saw Dr. Eriksen in the orthopedic department at the University of Toledo for her back pain. ECF Dkt. #13 at 394. Upon examination, Plaintiff had normal grip strength, negative straight leg raising test, a grossly normal gait and normal toe and heel walking. *Id.* at 395. An EMG was recommended as well as injections and Plaintiff expressed anxiety over both of these procedures. *Id.* She was also advised to quit smoking and a new MRI was ordered. *Id.*

On January 11, 2008, Plaintiff followed up with Dr. Elgafy still complaining of low back pain and radiular pain in her left lower extremity. ECF Dkt. #13 at 393. He recommended an EMG to assess acute versus chronic radiculopathy and he scheduled an epidural injection. *Id.*

On January 14, 2008, Plaintiff followed up with Dr. Goyal and he noted that the orthopedic surgeon refused to perform surgery on Plaintiff due to her chronic smoking history and she was therefore referred for epidural injections for her back pain. ECF Dkt. #13 at 391. Dr. Goyal refused to refill Plaintiff's depression medication until she was seen by a psychiatrist. *Id.* at 392. Plaintiff's blood pressure was higher at this visit as it was noted that she did not take her medication that morning. *Id.* Plaintiff's COPD history was stable. *Id.*

On February 6, 2008, Dr. Rizk of the Physical Medicine and Rehab Clinic wrote Dr. Elgafy a letter indicating that he examined Plaintiff for her low back pain. ECF Dkt. #13 at 389. Plaintiff explained that her back pain had worsened over the last few months and therapy she had in the past did not help. *Id.* Physical examination showed wheezes on both sides of Plaintiff's chest and positive straight leg-raising into the left lower extremity. *Id.* at 390. Dr. Rizk recommended that Plaintiff continue her medications and receive epidural injections for her radiculopathy. *Id.* Plaintiff refused to undergo an EMG and nerve conduction study because of the pain of the needle. *Id.*

On March 10, 2008, Plaintiff followed up with Dr. Goyal complaining of low back pain with numbness in her left lower extremity and she was anxious and nervous during the examination. ECF Dkt. #13 at 387. Upon examination, Plaintiff had clear breath sounds, mild tenderness on the lower lumbar vertebrae, but normal power and sensation in both lower extremities. *Id.* at 388. Dr. Goyal refilled Percocet for her back pain and asked if Plaintiff wanted a referral to the psychiatric clinic for her depression, but she responded that she wanted to wait. *Id.* He also counseled her on

-7-

her continued smoking with COPD, but Plaintiff refused to stop smoking.  *Id.*

On May 5, 2008, Plaintiff followed up with Dr. Goyal.  ECF Dkt. #13 at 386.  He noted that Plaintiff had been doing well since her last appointment.  *Id.*  He indicated that Plaintiff was chronically on Percocet for her back pain.  *Id.*  He noted that Dr. Elgafy refused to operate on Plaintiff's back because of Plaintiff's COPD and tobacco abuse.  *Id.*  Dr. Goyal noted that Plaintiff reported that her back pain was still achy and rated a 7-8 out of 10 on the pain scale.  *Id.*  He referred her again for a steroid injection.  *Id.*  He noted that Plaintiff's COPD was stable and Plaintiff stated that her depression was doing well and she did not want to see a psychiatrist.  *Id.*

On May 20, 2008, Dr. Atallah of the Pain Medicine Center evaluated Plaintiff for her low back pain.  ECF Dkt. #13 at 365.  Plaintiff informed him that her average pain rated 5 of a 10 and she saw Dr. Elgafy and Dr. Abumeri who refused to operate on her because she smoked.  *Id.*  Plaintiff reported that the pain decreased with hot baths and pain medications and increased with lifting, going up stairs, walking too much and standing for long periods of time.  Upon examination, Dr. Atallah found that Plaintiff had an antalgic gait on the left side, she could heel and toe walk with no pain, she had good extension, but limited range of lumbar spine motion, and positive straight leg raising on the left.  *Id.*  He diagnosed lumbar radiculopathy and disc herniation and recommended a left transforaminal epidural steroid injection.  *Id.* at 366.  On May 29, 2008, Plaintiff presented to Dr. Atallah for a left transforaminal epidural steroid injection at L5.  *Id.* at 363, 383.

On June 23, 2008, Plaintiff presented to Dr. Mutgi upon noticing a lump in her right breast that she had discovered four days prior.  ECF Dkt. #13 at 381.  She denied breast trauma, chest pain or shortness of breath, but complained of a burning feeling in the area.  *Id.*  She denied any other medical problems and physical examination revealed clear breath sounds, but a firm hard palpable nodule in the right breast.  *Id.* at 382.  Dr. Mutgi indicated that Plaintiff's blood pressure was well controlled, she should continue on medication for her anxiety and depression, she should follow up with Dr. Attalla for her back pain once the breast biopsy results were available, and he referred her to Dr. Chaudhuri for the right breast lump.  *Id.*

On June 27, 2008, Plaintiff presented to Dr. Chaudhuri for evaluation of a palpable mass in her right breast.  ECF Dkt. #13 at 380.  On June 30, 2008, Plaintiff presented to Dr. Chaudhuri for

follow up of the breast mass and had a mammogram and ultrasound which revealed a malignant lesion. *Id.* at 379. On July 8, 2008, Dr. Chaudhuri performed a lumpectomy and biopsy, which showed a right breast invasive ductal carcinoma. *Id.* at 377. Plaintiff underwent chemotherapy and was tolerating it "very well." *Id.* at 428-429. She did complain of back pain, decreased sleep and depression. *Id.* at 429, 449. On September 5, 2008, Dr. Chaudhuri inserted a subclavian vein port into Plaintiff so that she could receive chemotherapy. *Id.* at 438.

On September 29, 2008, Plaintiff followed up with Dr. Goyal. ECF Dkt. #13 at 433. It was noted that Plaintiff was given a prior prescription for Prozac due to her depression and she was given a prescription for Ambien for her sleep problems. *Id.* However, Plaintiff reported that she stopped taking Prozac because it gave her headaches. *Id.*

On October 1, 2008, Plaintiff underwent a 3D lumbar spine MRI which showed moderate lumbar spondylosis and mild scoliosis. ECF Dkt. #13 at 456.

On October 8, 2008, Plaintiff was evaluated by Dr. Farrell at the University of Toledo Medical Center for her complaints of chronic low back pain. ECF Dkt. #13 at 430. Dr. Farrell reviewed Plaintiff's medical history and upon examination, he found that her blood pressure was normal, she had symmetrical deep tendon reflexes, grossly intact motor strength, normal joint range of motion, and some mild restriction on flexion and extension. *Id.* at 431. Dr. Farrell diagnosed chronic low back pain with possible components of spondylosis. *Id.*

On October 9, 2008, Plaintiff presented to Dr. Arar at the University of Toledo Medical Center Department of Psychiatry for an outpatient psychiatric evaluation. ECF Dkt. #13 at 503. Plaintiff indicated that she would rather be in bed than at the evaluation because of her pain and nausea. *Id.* She explained that she had been in the emergency room the night before due to back pain that she suffered even though she had Percocet and the nausea she suffered despite anti-emetics. *Id.* Plaintiff further explained that she no longer wanted to do things or be around people and her mood had not returned to what was normal for her. *Id.*

Plaintiff stated that she slept only three to four hours per night and had difficulty falling asleep and staying asleep, even with Ambien. ECF Dkt. #13 at 504. She reported that her thoughts raced, she lost interest in things she used to enjoy, and she felt worthless because she could no longer

-9-

work.  *Id.*  She indicated that she had no appetite due to the chemotherapy and felt as if she could not sit still.  *Id.*  She denied suicidal and homicidal thoughts and hallucinations.  *Id.*  Plaintiff indicated that she previously tried group therapy years ago for anxiety but she did not like the therapy so stopped going.  *Id*. at 505.  She also tried Celexa before but it did not help her and she tried Prozac but it gave her headaches.  *Id*.  She explained that she started Xanax recently and took a low dose twice per day and it seemed to ease her pressures, but her doctor told her that she needed to see a psychiatrist before she could get any more.  *Id.*

Plaintiff reported that she smoked one and one half packs of cigarettes per day and drank alcohol once per month.  ECF Dkt. #13 at 506.  She rated her back pain as a 4 out of 10 and said that she took Percocet four times per day over the last year, but she had to go to the emergency room the night before the evaluation for shooting back spasms and nausea  *Id*.  She indicated that she took regular classes in school and she worked in the past as a cashier and at a fast food restaurant.  *Id*.  Her longest period of work held in one place was three years.  *Id.*

Dr. Arar diagnosed recurrent moderate major depressive disorder without psychotic features, dysthymic disorder of late onset, generalized anxiety disorder and panic disorder with agoraphobia.  ECF Dkt. #13 at 513, 526.  He rated her GAF at 55-60.  *Id*.  at 514.  He noted that Plaintiff received her GED but had low average intelligence.  *Id*. at 513.  Dr. Arar recommended that Plaintiff seek further pain management for her back pain since the Percocet was not working and she should continue eating balanced meals,  *Id.* at 514.  He prescribed Remeron, an antidepressant for Plaintiff's depression and sleep problems, and he prescribed her Klonopin for anxiety and panic attacks.  *Id.*  He continued Plaintiff's Ambien and recommended that they discuss supportive psychotherapy and cognitive behavioral therapy in the future.  *Id.*

On November 12, 2008, Plaintiff presented to Dr. Arar for medication management.  ECF Dkt. #13 at 533.  She reported no changes in her mood, with her depression at a 2-3 of 10 and her anxiety at 8-10 out of 10.  *Id*.  She indicated that she had 3-4 panic attacks over the last month and had trouble sleeping.  *Id*.  Upon examination, Plaintiff had no suicidal or homicidal ideations, no hallucinations, and she had a depressed mood, appropriate affect, normal speech, and intact thought content, memory and orientation.  *Id*. at 534.  Dr. Arar increased the Klonopin.  *Id.*

-10-

On January 12, 2009, Plaintiff presented to Dr. Arar.  ECF Dkt. #13 at 531.  She reported no changes in her mood and rated her depression as 2 of 10 and her anxiety as 8 of 10.  *Id*.  She indicated that she had three panic attacks over the last month triggered by crowds and she had problems sleeping.  *Id*.  Upon examination, Plaintiff had no suicidal or homicidal ideations, no hallucinations, normal affect and speech, and intact thought content and memory.  *Id*. at 531-532. Dr. Arar increased the Remeron and Klonopin.  *Id*. at 532.

On February 2, 2009, Plaintiff followed up with Dr. Mohamed for her breast cancer.  ECF Dtk. #13 at 419.  Plaintiff complained of arthritic pain, loss of her fingernails, and anxiety and depression from her cancer treatment.  *Id*.

On February 16, 2009, Plaintiff presented to the psychiatric clinic for medication management.  ECF Dkt. #13 at 529.  She rated her depression as a 3 of 10 and her anxiety as a 6-7 of 10.  *Id*.  She indicated that she had five panic attacks over the last month due to excessive worries and difficulty falling asleep.  *Id*.  She reported that Klonopin was not working and she requested that she be put back on Xanax.  *Id*.  Upon examination, Dr. Arar noted that Plaintiff's mood was dysphoric, she had no suicidal or homicidal ideations or hallucinations, her affect was appropriate and her speech was normal, and her thought content, memory and orientation were intact.  *Id*. at 530. He increased Plaintiff's Remeron, discontinued the Klonopin and returned Plaintiff to Xanax.  *Id.*

On March 2, 2009, Plaintiff followed up with Dr. Mohamed.  ECF Dkt. #13 at 416. He noted that Plaintiff had been doing well since her right mastectomy except for nail changes and a persistent cough due to bronchitis.  *Id*.  She also complained of joint pain and muscle soreness and anxiety and depression.  *Id*.  He indicated that Plaintiff's cough and shortness of breath were due to her excessive smoking.  *Id*.  Plaintiff also met with Dr. Feldmeier, who observed that she was very depressed and complained of chronic joint pain secondary to chemotherapy.  *Id*. at 418.  Her Vicodin prescription was renewed and Dr. Feldmeier noted that Plaintiff had one more cycle of chemotherapy before undergoing radiation therapy.  *Id.*

On March 16, 2009, Plaintiff followed up with Dr. Arar for medication management.  ECF Dkt. #13 at 527.  She reported improvement in her depression and rated her mood as 5 of 10, but she indicated that her anxiety had worsened to 10 of 10.  *Id.*  She indicated that she had two panic attacks

that occurred when she was close to crowds and she was having trouble sleeping.  *Id*.  She did not have suicidal ideations or hallucinations, and her mood was dysphoric, her affect restricted, but her speech was normal and her memory and thought content and processes were intact.  *Id*. at 527-528. Dr. Arar increased Plaintiff's Xanax dosage.  *Id*. at 528.

On April 6, 2009, Plaintiff followed up with Dr. Goyal, who reported that Plaintiff was done with chemotherapy.  ECF Dkt. #13 at 496.  Plaintiff complained of shortness of breath and coughing while undergoing the treatment.  *Id*.  After the treatment stopped, Plaintiff felt much better and her shortness of breath stopped.  *Id*.  It was reported that Plaintiff "feels very good at this point."  *Id*. Upon physical examination, Dr. Goyal noted that Plaintiff had reported extremity numbness upon beginning chemotherapy and Lyrica and Neurontin were prescribed but did not help.  *Id.*

On April 27, 2009, the oncology department requested a psychiatric evaluation for Plaintiff. ECF Dkt. #13 at 521.  Plaintiff had reported severe anxiety at her outpatient appointment and she told Dr. Rais of the Psychiatry Department that her anxiety was getting worse as she was always worrying about something.  *Id*.  Plaintiff was cooperative and Dr. Rais noted that she had intact comprehension, fund of knowledge, concentration, judgment, insight and reliability.  *Id*. at 525-526. He diagnosed her with major recurrent depressive disorder, moderate, and generalized anxiety disorder.  *Id.* at 526.  Her GAF was 50 and Dr. Rais prescribed Effexor, Klonopin and Xanax.  *Id.*

Plaintiff presented to the psychiatric clinic for medication management on June 8, 2009 and she reported that she was feeling better.  ECF Dkt. #13 at 519.  She rated her mood as 3 out of 10 and her anxiety was a 7-8 out of 10.  *Id*.  She reported 12-15 panic attacks over the last three months, with her most recent occurring on April 27, 2009 in the radiology clinic.  *Id*.  Plaintiff stated that she felt little improvement on Effexor and the Klonopin made her feel tired and she stopped taking Remeron.  *Id*.  Her mood was described as depressed and anxious, her affect was appropriate and her speech was normal.  *Id*.  She denied suicidal thoughts and hallucinations and had intact thought content, processes and memory.  *Id.* at 520.  Plaintiff's Effexor dosage was increased, she was switched to Xanax for her anxiety, and Klonopin and Remeron were discontinued.  *Id.*

On June 22, 2009, Dr. Feldmeier reported on Plaintiff's right breast cancer and treatment. ECF Dkt. #13 at 472.  He noted that Plaintiff did very well physically during radiation therapy, but

-12-

she had emotional problems during the treatment.  *Id.*  Dr. Feldmeier called psychiatry to come to the clinic for Plaintiff, but she became disturbed by that and took a self-imposed break from treatment between May 5, 2009 and May 21, 2009.  *Id.* She then returned.  *Id.*  It was noted that Plaintiff became claustrophobic, she felt extremely tired, had difficulty even climbing one flight of stairs, she slept less, and had joint pain, night sweats and occasional joint pain.  *Id.* at 473.  She also admitted being depressed and anxious.  *Id.*  Upon completion of her radiation, Plaintiff was very happy and was in a "much better frame of mind."  *Id.* at 474.

On July 5, 2009, Plaintiff had a follow up with the psychiatry department at the University of Toledo Medical Center.  ECF Dkt. #13 at 517.  She reported that she was tolerating her medications well and she indicated that the Xanax helped her sleep.  *Id.*  She stated that the number of doctor appointments that she had was overwhelming and she and the doctor discussed the option of increasing the Effexor dosage.  *Id.*  Her mood was depressed and anxious, her affect was appropriate and her speech was normal.  *Id.*  She had intact thought content, no suicidal ideations or hallucinations, and her memory was intact.  *Id.* at 518.  He increased her Effexor dosage.  *Id.*

Plaintiff presented to Dr. Goyal on July 8, 2009 for follow up and complained of mild tingling in her lower extremities, especially her toes and fingers.  ECF Dkt. #13 at 620.  He noted that she was diagnosed with chemotherapy induced neuropathy.  *Id.*  She continued to smoke and told him she was not in a position to quit.  *Id.*  Upon examination, Dr. Goyal found that Plaintiff had mild sensory deficits in her bilateral lower extremities with no muscle wasting or loss of motor strength.  *Id.*  He noted that Plaintiff's blood pressure and COPD were well controlled on medication.  *Id.* at 621.  He noted Plaintiff's complaints of low energy levels and loss of appetite and she declined appetite stimulants and he advised her to start exercising to increase her appetite.  *Id.*

On August 3, 2009, Plaintiff presented to Dr. Arar for medication management and she rated her anxiety as a 7-8 of 10 and her depression as 5 of 10, with difficulty falling asleep and 3-4 panic attacks over the last month.  ECF Dkt. #13 at 648.  Her Effexor dosage was increased.  *Id.* at 649.

On August 12, 2009, Plaintiff presented to Dr. Arar and reported her anxiety as a 7-8 of 10 and her mood as a 5 of 10.  ECF Dkt. #13 at 648.  She reported difficulty falling asleep and had 3-4 panic attacks during the month.  *Id.*  Plaintiff's Effexor dosage was increased.  *Id.* at 649.

On August 24, 2009, Plaintiff presented to Dr. Hinch for a narcotic refill and she complained of numbness and tingling in her hands and feet. ECF Dkt. #13 at 616. He noted that Plaintiff had no chest pain and her COPD was stable. *Id*. He also noted that Plaintiff had a history of depression and followed with the psychiatry department, and "seems to be coping up well with it." *Id*. He indicated that he had discovered that Plaintiff was obtaining Vicodin from Dr. Mohamed and Percocet from his clinic and she opted for Percocet when told that she could take only one of them. *Id*. A toxicology screen was ordered. *Id*. Physical examination revealed no edema in the lower extremities and normal strength in all muscle groups. *Id*. Dr. Hinch diagnosed chemotherapy induced neuropathy and he prescribed Neurontin. *Id*. He also diagnosed: right breast cancer post chemotherapy and radiation and currently disease free; depression, for which she took Effexor and was followed by the psychiatry department; uncontrolled hypertension; COPD with no exacerbations; and pain management. *Id*. at 617.

On September 1, 2009, Dr. Tanley, a Clinical Psychologist and Neuropsychologist, evaluated Plaintiff and issued a disability assessment report. ECF Dkt. #13 at 539. At the interview, Plaintiff told Dr. Tanley that she had three bad discs in her lower back, she broke both of her legs and had a rod in one of them, she had chemotherapy for her breast cancer which made her fingers and toes numb, she had mitral valve prolapse and COPD, and she had depression, anxiety and panic attacks. *Id.* She also reported that she dropped out of regular school classes in the ninth grade and she then obtained her GED. *Id*. She told him that she awakened at 8 a.m. and spent her days watching television, washing dishes, vacuuming, or doing whatever she felt she could do. *Id*. at 540.

Dr. Tanley observed that Plaintiff was cooperative, appeared motivated, and did not seem to exaggerate or minimize her symptoms. ECF Dkt. #13 at 540. He found that her thoughts were coherent and relevant, her speech was adequate, her affect was bland, and her eye contact was variable. *Id*. He found no evidence of preoccupations, delusions, hallucinations or unusual thought content, and noted that her memory was intact and her judgment was sufficient. *Id*. He concluded that Plaintiff's intellectual functioning appeared to be no lower than borderline. *Id*.

Dr. Tanley diagnosed Plaintiff with depressive disorder, not otherwise specified, panic disorder with agoraphobia, and borderline intelligence. ECF Dkt. #13 at 541. He opined that

-14-

Plaintiff's "[f]unctional severity appears to be no worse than 80" and he concluded that her ability to relate to others was unimpaired and while she could comprehend and complete simple, routine, daily living activities at home and in the community, she would have mild problems understanding, remembering and following instructions.  *Id*.  He also concluded that Plaintiff's concentration, persistence and pace were mildly impaired.  *Id*.  As to the ability to withstand the stress and pressures of daily work, Dr. Tanley opined that Plaintiff's panic attacks, "in addition to bland affect with variable eye contact, an appetite and sleep disturbance, mood problems, anhedonia, and the cognitive insufficiency of Borderline intellectual functioning markedly impairs this domain."  *Id*.

On September 8, 2009, Plaintiff presented to the emergency department due to back pain. ECF Dkt. #13 at 607.  She ambulated without difficulty and reported that her medications were not working for her back pain.  *Id*. at 608.  Physical examination showed no pain with straight leg raising and mild diffuse lumbar tenderness without swelling, redness or warmth.  *Id*. at 309.  Plaintiff reported that she smoked one pack of cigarettes per day and she denied the use of alcohol.  *Id*. at 607. She was diagnosed with lumbosacral pain and given injections of pain medications.  *Id.* at 609.

On September 21, 2009, Plaintiff presented to Dr. Goyal for a follow up appointment.  ECF Dkt. #13 at 605.  Dr. Goyal noted that at Plaintiff's last visit, he learned that Plaintiff was obtaining Vicodin from Dr. Mohamed and Percocet from him and when Plaintiff was advised not to take both medications, she opted for Percocet.  *Id.*  His physical examination revealed some tenderness in her sacral area and he diagnosed peripheral neuropathy secondary to chemotherapy and he increased Plaintiff's Neurontin dosage.  *Id*.  He diagnosed right sided breast cancer post radiation and chemotherapy.  *Id*.  He also diagnosed COPD and noted that she had an inhaler and he diagnosed hypertension and noted that it was well-controlled on medication.  *Id.*  He further diagnosed tobacco abuse and offered Plaintiff help to quit.  *Id*.

On September 21, 2009, Plaintiff presented to Dr. Arar and indicated that she had been off of Xanax for about 20 days and was unable to refill a prescription because her insurance would not cover it.  ECF Dkt. #13 at 646.  Her mood was low and she had difficulty staying asleep.  *Id*.  Her Effexor medication was continued, she was given a prescription for Vistaril and Xanax was continued, although she was encouraged to limit its use when she was able to start again.  *Id*. at 647.

-15-

On October 8, 2009, Plaintiff presented to Dr. Mohamed for follow up of her breast cancer, nicotine dependence and anxiety disorder.  ECF Dkt. #13 at 603.  He noted that she had completed chemotherapy and radiation and felt extremely tired, with night sweats, sinus problems and occasional arthritic joint pains.  *Id.*  She also admitted being depressed and anxious.  *Id.*  Her blood pressure was 120/109 and upon recheck, 150/92.  *Id.*  Dr. Mohamed prescribed medication and asked her to continue monitoring her blood pressure.  *Id.*  He also indicated that Plaintiff was "gladly willing to cease smoking" and was following up with her psychiatrist in order to do it.  *Id.* at 604.  She was also following up with her psychiatrist concerning her anxiety.  *Id.*  As for her breast cancer, Dr. Mohamed noted that she completed full courses of chemotherapy and radiation and besides being fatigued, Plaintiff had no symptoms.  *Id.*

On October 9, 2009, Dr. Khan  of the agency completed a psychiatric review technique and mental RFC form.  ECF Dkt. #13 at 545-561.  He reviewed the record and assessed Plaintiff's impairments from June 2, 2009 through October 9, 2009 under Listing 12.02 for organic mental disorders based upon Plaintiff's estimated borderline intellectual functioning, Listing 12.04 for affective disorders based upon Plaintiff's depressive disorder not otherwise specified, and Listing 12.06 for anxiety-related disorders based upon Plaintiff's panic disorder with agoraphobia.  *Id.* at 545.  He found that Plaintiff's impairments mildly restricted her activities of daily living, caused mild difficulties in maintaining social functioning and caused moderate difficulties in maintaining concentration, persistence or pace, and did not cause her to experience any episodes of decompensation.  *Id.* at 555.  As to Plaintiff's mental RFC, Dr. Khan concluded that Plaintiff was not significantly limited in: remembering locations and work-like procedures; understanding, remembering and carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; working in coordination or proximity to others without being distracted by them; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior; being aware of normal hazards; traveling in unfamiliar places and taking public transportation; and in setting realistic goals

or making plans independently of others. *Id.* at 559-560. He found that Plaintiff was moderately limited in: understanding, remembering and carrying out detailed instructions; maintaining concentration and attention for extended periods; performing activities within a schedule, maintaining regular attendance and being punctual; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and the ability to respond appropriately to changes in the work setting. *Id.*

In his functional capacity assessment, Dr. Khan indicated that his mental RFC did not adopt the prior ALJ's mental RFC due to Dr. Tanley's opinion that Plaintiff had borderline intellectual functioning and the most recent mental status examination showing Plaintiff would have moderate limitations in concentration, persistence and pace as she made two errors with serial 3s and exhibited some memory problems. ECF Dkt. #13 at 561. Dr. Khan indicated that he attributed little weight to Dr. Tanley's opinions that Plaintiff had mild concentration, persistence and pace difficulties and markedly limited stress tolerance. *Id.* He noted that Plaintiff did not have a history of decompensation and no psychotic symptoms of suicidal/homicidal ideations were reported. *Id.* He further indicated that Plaintiff did not cry during Dr. Tanley's examination and her psychomotor activity was normal. *Id.* He opined that the evidence better supported moderate limitations in concentration, persistence and pace because of the serial 3s and other memory errors and she was able to relate adequately at the examination but this was not a normal activity. *Id.* Dr. Khan concluded that Plaintiff could learn and perform simple one to three-step tasks in a routine and predicable environment. *Id.*

On November 18, 2009, Dr. Caldwell reviewed Plaintiff's file and completed a physical RFC for the agency. ECF Dkt. #13 at 563-568. She considered Plaintiff's primary diagnosis of breast cancer and her other alleged impairments of back pain, COPD, and mitral valve prolapse, and she concluded that Plaintiff could lift up to ten pounds frequently and twenty pounds occasionally, sit and stand and/or walk up to six hours per eight-hour workday, with no other limitations. *Id.* Dr. Caldwell explained that she was adopting the prior ALJ's RFC dated January 18, 2005. *Id.* at 564. She further indicated that Plaintiff's credibility regarding her current problems with her back, COPD

-17-

and mitral valve prolapse was only partially credible because her primary care physician did not note any current difficulties with these conditions. *Id*. at 568. Dr. Caldwell further concluded that some of Plaintiff's complaints concerning her fatigue, numbness and shortness of breath could be caused by her breast cancer and treatment. *Id*.

On November 30, 2009, Plaintiff presented to the emergency room complaining of back pain sustained from a fall. ECF Dkt. #13 at 589, 591. She reported that she was walking with her laundry and she fell and hit a tree. *Id*. at 591. A half empty 40 ounce beer was found at the scene. *Id*. Plaintiff stated that she smoked two packs of cigarettes per day and drank one 40 ounce beer per day. *Id*. Examination revealed a superficial abrasion on the left side of Plaintiff's forehead and Plaintiff's back was tender to palpation. *Id*. at 592. It was reported that she had the demeanor of an intoxicated person, but she ambulated without difficulty, her neck exam was normal and she had no significant muscle spasm. *Id*. The emergency room doctor noted his suspicions that Plaintiff was an alcoholic and he ordered a CAT scan due to his suspicion and Plaintiff's acute intoxication. *Id*. He diagnosed Plaintiff with a contusion and lumbar strain and sprain and ordered lumbar spine x-rays. *Id*. at 593.

The CT scan of Plaintiff's brain showed no hemorrhage or fracture and a hematoma along Plaintiff's left forehead. ECF Dkt. #13 at 599. The CT scan also showed cortical atrophy "which appears to be prominent for the Plaintiff's age, this may be secondary to alcohol use although there is limited posterior fossa atrophy to support this." *Id*.

The lumbar spine x-rays on November 30, 2009 showed extensive degenerative change of the lumbar spine from a prior 2008 CT scan. ECF Dkt. #13 at 601. There was osteophyte formation at L3-L4 and more prominently at L4-L5 and L5-S1. *Id*. It also showed spondylosis at L3-L4, L4-L5, and L5-S1, with worsened disc narrowing at L5-S1. *Id*. Degenerative joint disease from the hips was diagnosed as well. *Id*.

On December 16, 2009, Dr. Caldwell again reviewed Plaintiff's file and completed a physical RFC for the agency. ECF Dkt. #13 at 571-578. She again considered Plaintiff's primary diagnosis of breast cancer and her other alleged impairments of back pain, COPD, and mitral valve prolapse, and she made the same conclusions as to light work. *Id.* at 571-572. She explained that she looked at the final findings of the ALJ's RFC dated June 3, 2002 and concluded that Plaintiff's current file

-18-

did present new and material changes in that the prior ALJ's RFC was for medium level work when the current medical record supported a limited light work RFC . *Id*. at 572.  Dr. Caldwell reasoned that Plaintiff did well with radiation and some of the symptoms she was alleging would subside as a side effect of the breast cancer treatment.  *Id*. at 575-576.  She further found that the medical evidence did not support the degree of functional limitations that Plaintiff was alleging.  *Id*. at 576. Dr. Hinzman reviewed this assessment and confirmed it in June 2010.  *Id*. at 657.

On February 8, 2010, Plaintiff presented to the oncology department for a follow-up with Dr. Mohamed.  ECF Dkt. #13 at 581.  He outlined Plaintiff's medical history concerning breast cancer and her completion of treatment.  *Id.*  He noted that she continued to feel tired, but her effort tolerance had improved.  *Id*.  He further noted that Plaintiff continued to smoke cigarettes and she was anxious, especially since she had an abnormal mammogram in December of 2009.  *Id.*  The study was consistent with a scar, but because Plaintiff felt that what she felt was different than a scar, Dr. Mohamed ordered a MRI which showed no abnormality suggestive of recurrent tumor.  *Id*. at 581, 583.  Dr. Mohamed indicated that "[o]ther than that, Tammy is doing very well." *Id*. at 581.

Upon examination, Dr. Mohamed indicated that Plaintiff had no complaints.  ECF Dkt. #13 at 581.  Her chest and heart were normal, as were her head and neck examination.  *Id*.  Her extremities showed no edema.  *Id.*  He referred her for a massage of the lumpectomy scar.  *Id*.

On February 22, 2010, Plaintiff presented for a check-up with Dr. Hinch at the University of Toledo Medical Center Division of General Internal Medicine.  ECF Dkt. #13 at 579.  He noted that Plaintiff had lost her health insurance and was concerned about not being able to follow up with them.  *Id*.  Dr. Hinch indicated that Plaintiff was getting Percocet from his department and was also getting Vicodin from Dr. Mohamed's clinic.  *Id.*  When he asked whether she was getting regular pain medications from any other doctor, she denied doing so even though he ran an Ohio automated report which showed that she was doing so.  *Id.*  Dr. Hinch told Plaintiff that he could not prescribe pain medications long-term and he advised her to return to orthopedics and follow their recommendations as to quitting smoking.  *Id.*  Plaintiff then indicated that she received pain medication very rarely from Dr. Mohamed, but Dr. Hinch indicated that the report was "very contrary to this." *Id.*  He noted that when he showed her the report indicating that this was not true,

-19-

stormed out of the clinic and was very angry. *Id.* Dr. Hinch stated that "[w]e will not be prescribing her controlled medications in the future." *Id.*

On May 28, 2010, Dr. Richardson reviewed Plaintiff's file and affirmed the prior assessment from October 9, 2009. ECF Dkt. #13 at 656. He noted that Plaintiff did not allege any changes for reconsideration and he noted that at the initial level, Plaintiff had a psychiatric treating source but did not report one currently. *Id.* He further noted that she was getting narcotic pain medications from multiple doctors and the record contained many references to alcohol abuse. *Id.* Dr. Richardson opined that these factors reduced Plaintiff's credibility and he otherwise affirmed the October 9, 2009 assessment. *Id.*

On July 6, 2011, Plaintiff presented to the emergency room complaining of back and left hip pain after falling out of a hammock one week prior. ECF Dkt. #13 at 663. No numbness or motor weakness was reported, but Plaintiff reported that movement exacerbated her pain. *Id.* Physical examination revealed tenderness to the left buttock and left hip and pain with movement and positional changes. *Id.* at 664. Lumbar spine x-rays showed no fracture, bony lesion or spondylosis and hip x-rays showed no abnormalities. *Id.* at 665-667. The lumbar x-ray did show disc space narrowing at L3-L4, L4-L5 and L5-S1 with minimal spurring at L4 and L5 and a few ostephytes. *Id.* It further showed loss of the normal lordotic curvature that may have been related to spasm. *Id.* The impression was that Plaintiff had mild discogenic disc disease. *Id.* Plaintiff reported that she smoked two packs of cigarettes per day and consumed alcohol socially. *Id.* at 664. She was diagnosed with a contusion to the left buttock area and prescribed Flexeril, Motrin 800 milligrams and 20 Vicodin tablets. *Id.* at 671.

On July 29, 2011, Plaintiff presented to the emergency room complaining of back and left leg pain starting from the hip and radiating downward. ECF Dkt. #13 at 692. No numbness was reported and motor weakness was not present, but Plaintiff had paraspinal tenderness in the left lower back. *Id.* Plaintiff reported no falls or injuries and no gait changes. *Id.* at 692-693. Plaintiff was diagnosed with chronic lumbar pain and prescribed Ultram. *Id.* at 692, 694.

### III.   TESTIMONIAL EVIDENCE

Plaintiff was 48 years old at the time of the hearing. ECF Dkt. #13 at 55. She is divorced, is 5'4" tall and weighed 132 pounds. *Id*. She completed the eighth grade and then obtained her GED. *Id.* at 57. She attempted to go to college, but she could not keep up and did not do well. *Id*. She last worked in 1996 or 1997 at Kentucky Fried Chicken preparing food and washing dishes. *Id*. She was living with two friends. *Id.* at 70.

Plaintiff discussed her impairments, first talking about her breast cancer and treatment. ECF Dkt. #13 at 60. She testified that symptoms and side effects from the chemotherapy and radiation included nausea, weakness and frustration, which had only gotten worse since her treatment ended. *Id.* She reported that her feet and hands go numb and tingle and started to do so after chemotherapy. *Id.* at 61. She testified that she was told that it would go away from treatment, but it did not. *Id*. She described it as constant and explained that she sometimes has trouble feeling a surface that she is stepping on or feeling if something is hot. She also discussed her back pain with pain that radiated down her left leg, which is made worse by moving around more than usual. *Id.* at 63. She reported that sometimes she falls because her leg gives out. *Id*. at 64.

Plaintiff testified that she had been without health insurance for the past two years, so she had to wait to get treatment from the clinics. ECF Dkt. #13 at 64. She indicated that she also had breathing problems and used an inhaler, although she admitted that she continued to smoke half a pack of tobacco per day. *Id*. at 65. She discussed her high blood pressure, but indicated that she was not currently on medication because she could not afford it. *Id*. at 66. Plaintiff stated that she also stopped receiving mental health counseling and medications for her mental health because she did not have insurance and a place that she could attend wanted her to go to group therapy, but she got too nervous around groups of people. *Id*. at 67. She further testified that she was currently taking over the counter pain medications. *Id*. at 68.

Plaintiff reported that she had trouble sleeping and had trouble climbing over her tub to take a shower or bath. ECF Dkt. #13 at 69. She was physically capable of dressing herself, but she said that she did not want to do so and sometimes kept the same clothes on because it was too much work to try and find something to wear. *Id*. She mostly microwaved food and did not cook anymore. *Id.*

at 70. She did wash dishes, but only if there were a few because her neck and back would hurt if she stood too long. *Id.*

Plaintiff also testified that she last drank alcohol three or four months ago, but prior to that she would drink a 40 ounce of beer every day. ECF Dkt. #13 at 71. She stated that she had stopped drinking because her stomach hurt when she drank. *Id.* at 72.

She also indicated that she does not get along with people, she had no hobbies, and spent her days watching television, napping, and pacing back and forth in the house. ECF Dkt. #13 at 73, 75. She does not have a driver's license as she lost it in an accident 20 years ago and never got it back. *Id.* She cannot pay attention to any full program on television, she does not read, she has no friends that she speaks with or visits besides those with whom she lived, she does not grocery shop and she does not do laundry. *Id.* at 74-75. She opined that she could sit for a half an hour, stand for five to ten minutes, walk half a block at a time, and open doors, but she could not lift and carry a gallon of milk, had trouble opening jars and experienced numbness when she reached above her head. *Id.* at 75-78. Plaintiff also testified that her memory was not good and she tore up papers that her attorney gave her because she could not understand them and complete them and her children would not come over and help her. *Id.* at 79.

The VE then testified. The ALJ asked the VE to assume a person of the same age, education and work experience as Plaintiff who could: perform work at the light level; never climb ladders, ropes and scaffolds; only occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and remember and carry out one to three step instructions. ECF Dkt. #13 at 79-80. The VE testified that such a person could perform jobs in the national economy such as assembler of small products, garment sorter, and checker. *Id.* at 80-81.

The ALJ modified the hypothetical person, adding the limitation that she could have no fast-paced work or strict production quotas. ECF Dkt. #13 at 81. The VE responded that such a person with the additional limitation could still perform the garment sorter and checker jobs, and could also perform the job of laundry worker. *Id.*

The ALJ presented a second hypothetical person, this time with a sedentary work level, with limitations of lifting no more than 10 pounds occasionally, walking a block, standing for 5 to 10

minutes and sitting for a half an hour at which time she would need a sit/stand option, with limited foot control operation on the left to occasional, with the same postural limitations as the first hypothetical person, plus restrictions on overhead reaching, handling objects defined as gross manipulation in the bilateral, and fine manipulation limited to items no smaller than the size of a ball point pen occasionally, with feeling bilaterally to occasional, and the avoidance of environmental irritants such as fumes, odors, dusts and gasses, and the concentrated use of moving machinery and exposure to unprotected heights, with only occasional interaction with the public and co-workers. ECF Dkt. #13 at 82. The VE responded that no jobs in the national economy existed for such an individual. *Id.*

The ALJ then added limitations to his first hypothetical person, including an allowance that the person be off task 20 percent or more of the day in addition to regular breaks because of concentration from memory problems and lack of focus. ECF Dkt. #13 at 83. The VE indicated that no jobs existed in the national economy for such a person.

The ALJ removed the 20 percent off task limitation from the first hypothetical person and added a requirement that the person be able to take two to three unscheduled work breaks in an eight hour day to take twenty minutes naps. ECF Dkt. #13 at 83. The VE responded that this would be work preclusive. *Id.* She also responded that all jobs would be precluded for hypothetical person number one if that person additionally would be off of work four plus days per month due to symptoms, side effects of medications, depression and doctor visits. *Id.* The ALJ thereafter asked the VE to assume that all of Plaintiff's testimony as to her conditions and limitations was credible and supported and she was unable to engage in substantial sustained gainful activity. *Id.* at 84. No response from the VE is indicated in the typewritten transcript. *Id.*

**IV**. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

On September 8, 2011, the ALJ wrote a decision first noting that Plaintiff had submitted evidence that showed a new and material change in circumstances beginning January 19, 2005 so that under *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), he was not bound by the prior ALJ's findings as of that date. ECF Dkt. #13 at 18. The ALJ found that Plaintiff had not engaged in substantial gainful activity since June 2, 2009, the date of her most recent application, and she had

the severe impairments of status-post breast cancer radiation with weakness, back pain, leg pain, neuropathy of the feet and hands, brain stem syndrome, depression, and an anxiety disorder. *Id.* at 20. The ALJ further found that these severe impairments, individually or in combination, did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 21.

The ALJ also found that despite her impairments, Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling and crawling; and remembering and carrying out one to three step instructions. ECF Dkt. #13 at 25. Based upon this RFC and the testimony of the vocational expert ("VE"), the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy, including the representative occupations of small products assembler, garment sorter, and a checker. *Id.* at 38. He therefore found that Plaintiff was not entitled to SSI as she had not been under a disability since June 2, 2009. *Id.*

**V.      STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI. These steps are:

1.      An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. § 416.920(b) (1992));

2.      An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. § 416.920(c) (1992));

3.      If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. § 416.920(d) (1992));

4.      If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. § 416.920(e) (1992));

5.      If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be

considered to determine if other work can be performed (20 C.F.R.
§ 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citations omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that could have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## VII.    ANALYSIS

Rather than present each of her asserted issues as separate assertions of error, Plaintiff combines all of her arguments into one. The undersigned will attempt to address each assertion.

**A.    STEP TWO**

It appears that Plaintiff's first assertion is that the ALJ erred in failing to find that her COPD and her BIF were not severe impairments at Step Two of the sequential analysis.  ECF Dkt. #14 at 16-18.   The undersigned recommends that the Court find no merit to this assertion.

At Step Two of the sequential analysis, the ALJ determines whether a claimant's impairments are severe and whether they meet the twelve-month durational requirement.   20 C.F.R. § 404.1520(a).  At this Step, the claimant bears the burden of proving the threshold requirement of a "severe impairment." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  The claimant must also show that she suffered from a medically severe impairment or impairments that lasted or could be expected to last for a continuous period of at least twelve months.  *Id.*  The Court must apply a de minimis standard in determining severity at Step Two.  *Id.* at 862.  An impairment or combination of impairments is not severe  "...if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The types of "basic work activities" that qualify for use in the regulations are described in 20 C.F.R. §404.1521(b).  An impairment can be found non-severe only if it could constitute "a slight abnormality which has such a minimal effect on the individual that it could not be expected to interfere with an individual's ability to work, irrespective of age, education and past work experience." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985).  The goal of Step Two is to screen out totally groundless claims.  *Id.* at 89.

The ALJ in this case found at Step Two that Plaintiff's COPD was not a severe impairment.  ECF Dkt. #13 at 21.  Substantial evidence supports the ALJ's findings.  As Plaintiff points out, it is clear that Plaintiff has COPD.  ECF Dkt. #376, 379.  The ALJ acknowledged that Plaintiff was diagnosed with sinusitis, reactive airway bronchitis, tobacco abuse disorder, and later COPD, dating as far back as 2001.  *Id.* at 21, citing ECF Dkt. #13 at 407.  He explained that while Plaintiff required the use of inhalers and occasionally presented at examinations with wheezing, abnormal breath sounds or rales, she continued to use tobacco against doctors' advice, generally presented with normal cardiovascular findings at examinations, and her COPD was assessed as stable with medication.  *Id.*  The ALJ cited to examinations where Plaintiff did indeed present with shortness of breath and abnormal breath sounds on occasion, but he also cited to frequent occasions where

Plaintiff had no complaints of shortness of breath and her COPD was assessed as stable and well-controlled on medication. *Id.* at 21, citing to ECF Dkt. #13 at 361, 386-388, 393-395, 401, 403, 405-406, 412-416, 420, 427, 429, 447, 451-452, 496, 501, 504, 573, 576, 580, 583-584, 607, 609, 621, 678. The medical records also indicated that Plaintiff experienced shortness of breath due to excessive smoking and indicate that when she completed her chemotherapy, her shortness of breath decreased. *Id.* at 418, 496, 568.

As to Plaintiff's BIF, she is correct that the ALJ did not address this condition at Step Two of the sequential analysis. ECF Dkt. #13 at 20-21. However, even if the ALJ erred in not deeming Plaintiff's BIF and her COPD severe at Step Two, it is legally irrelevant since the ALJ specifically found other of Plaintiff's impairments severe and thereafter considered Plaintiff's severe and nonsevere impairments in the rest of the sequential analysis. *Anthony v. Astrue*, 266 Fed. Appx. 451, 457, 2008 WL 508008, at **5 (6th Cir. 2008), unpublished, quoting *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987)(ALJ's failure to find that a particular impairment was severe was harmless error where he deemed other impairments severe). And contrary to Plaintiff's assertion to the contrary, the ALJ did find that her BIF was an impairment and included a limitation in his RFC based upon Plaintiff's BIF by limiting her ability to remember and carry out instructions to one to three steps. *Id.* at 25-26. Accordingly, the undersigned recommends that the Court find no merit to Plaintiff's Step Two assertions of error.

## **B.    RFC**

Plaintiff also asserts that substantial evidence does not support the ALJ's RFC. The undersigned recommends that the Court find that substantial evidence supports the ALJ's physical RFC but substantial evidence does not support the ALJ's mental RFC for Plaintiff. Accordingly, the undersigned recommends that the Court remand the instant case for further evaluation and analysis of Plaintiff's mental RFC and the treatment of the mental health sources concerning the nature and severity of Plaintiff's mental impairments.

A claimant's RFC is the most that she can still do despite her functional limitations. 20 C.F.R. §416.945(a)(1); SSR 96-8p. The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions. 20 C.F.R. §416.945(a). The final

responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(d)(2). In determining RFC for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments including: mental and physical; exertional and nonexertional; and severe and nonsevere. *See* 42 U.S.C. §§423(d)(2)(B), (5)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir.1988).

Here, the ALJ found that Plaintiff could perform light work and only limited Plaintiff to no climbing of ladders, ropes or scaffolds, occasionally climbing ramps and stairs, occasionally balancing, stooping, kneeling, crouching and crawling, and remembering and carrying out one to three step instructions.  ECF Dkt. #13 at 25.  Substantial evidence supports these limitations and Plaintiff does not argue otherwise.

## 1.    PHYSICAL RFC

However, Plaintiff does argue that the ALJ should have included additional restrictions in his physical RFC for her, including manipulative limitations, overhead reaching limitations, and a sit/stand option due to her neuropathy of the feet and hands and back condition, and environmental limitations due to her COPD.  ECF Dkt. #14 at 19-22.

The ALJ discussed Plaintiff's back impairment and neuropathy of the feet and hands and he consequently included a light work determination with postural limitations of no climbing of ladders, ramps or scaffolds in part based upon the worsening of Plaintiff's back impairment and her status-post cancer with weakness and resultant peripheral neuropathy.  ECF Dkt. #13 at 25.  He noted Plaintiff's testimony concerning her back pain and the numbness and tingling in her fingers and feet due to cancer treatment, her inability to sit for more than thirty minutes at a time, difficulty bending, and difficulty lifting and picking up objects and reaching overhead.  *Id*. at 26.  The ALJ cited to the medical evidence showing the 2004 repair of Plaintiff's displaced tibial shaft and proximal fibular shaft that resulted in the placement of a rod.  *Id*. at 28, citing ECF Dkt. #13 at 279-288.  He cited to records documenting the numbness and tingling in Plaintiff's hands and feet through 2008 and into 2009.  *Id*. at 26-28, citing ECF Dkt. #13 at 420, 496, 498, 590-592, 608, 616.

However, the undersigned recommends that the Court find that the ALJ did not err in providing additional limitations based on Plaintiff's neuropathy.  The undersigned notes that no

treating physician provided limitations based upon Plaintiff's neuropathy.  Further, the ALJ cited to the medical evidence showing that Plaintiff  had only mild sensory deficits in her bilateral lower extremities, toes, and fingers in July 2009 with no muscle wasting or loss of motor strength and she had no deficits in sensation, reflexes or strength by August of 2009.  ECF Dkt. #13 at 28, citing ECF Dkt. #13 at 617-618, 620.  The ALJ also cited to treatment notes showing that in September 2009, Plaintiff reported continued lower extremity numbness but was able to ambulate effectively and she indicated that Neurontin was helping this condition.  *Id*. at 28, citing ECF Dkt. #13 at 605.  He also noted Dr. Mohamed's October 8, 2009 notation upon examination of Plaintiff that "apart from being fatigued and having very less energy, she does not have any symptoms."  ECF Dkt. #13 at 28, citing ECF Dkt. #13 at 604.  The ALJ also cited to a July 7, 2011 examination where Plaintiff presented with back pain but had no focal motor deficits, no sensory deficits, normal reflexes and a normal gait.  *Id*. at 28, citing ECF Dkt. #13 at 659.  This emergency room report also indicated that Plaintiff reported no numbness.  *Id*.  The ALJ also cited to an imaging study taken that day which showed only mild discogenic disease of the lumbar spine.  ECF Dkt. #13 at 31, citing ECF Dkt. #13 at 665.  The ALJ also noted an emergency room report dated July 27, 2011 where Plaintiff complained of left leg pain but reported no numbness and no motor weakness and she had no focal sensory or motor deficits and normal ranges of motions in her upper and lower extremities.  *Id.* at 28, citing ECF Dkt. #13 at 689.  He further cited to Plaintiff's report at the September 2009 consultative examination that she washed dishes and vacuumed.  *Id*. at 35, citing ECF Dkt. #13 at 540.  The ALJ also partially relied upon the physical RFC assessment provided by Dr. Caldwell and affirmed by Dr. Hinzman who concluded that despite her impairments which included her reports of fatigue and numbness, Plaintiff could perform light work with no additional limitations.  ECF Dkt. #13 at 35, citing ECF Dkt. #13 at 564-568.  The ALJ gave these opinions considerable weight but then added limitations concerning climbing and one to three step instructions based upon other medical evidence and Plaintiff's testimony.  *Id*. at 35.      While  substantial evidence could support a finding to the contrary, the proper standard of review is whether substantial evidence supports the ALJ's determination and the undersigned recommends that the Court find that the ALJ has provided substantial evidence to support his physical RFC based upon Plaintiff's neuropathy.

As to Plaintiff's complaints of fatigue, the undersigned also recommends that the Court find that substantial evidence supports the ALJ's RFC findings of light work with postural limitations. Again, the undersigned notes that no treating physician advanced limitations based upon Plaintiff's fatigue. Further, the ALJ noted Plaintiff's reports to medical providers about her fatigue following radiation therapy. ECF Dkt. #13 at 27-28, 32-35. He also noted her testimony before him concerning her fatigue. *Id*. at 34. However, the ALJ cited to Plaintiff's report in July 2008 that despite her insomnia and moderate fatigue, she was able to care for herself. *Id.* at 27, citing ECF Dkt. #13 at 447. He further cited to Plaintiff's January 2009 report that she felt tired and spent more than fifty percent of her day in a chair. *Id*. at 27, citing ECF Dkt. #13 at 422. However, the ALJ noted that by April of 2009, Plaintiff reported only occasional fatigue after reporting that her appetite was within normal limits. *Id*. at 27, citing ECF Dkt. #13 at 491. He noted Plaintiff's complaints of fatigue in June 2009 following her last round of radiation and Dr. Mohamed's note that he told her that her level of fatigue would improve within a few weeks after completion of radiation. *Id*. at 28, citing *Id.* at 473. The ALJ further noted Plaintiff's report in June of 2009 that she had near normal appetite and energy. *Id*. at 27, citing *Id*. at 481. He also cited to Plaintiff's report in October 2009 that despite feeling tired, she was still able to perform her routine activities. ECF Dkt. #13 at 28, citing ECF Dkt. #13 at 603. The ALJ further cited a February 2010 note that Plaintiff reported that she continued to be tired, but her effort tolerance had somewhat improved. *Id*. at 28, citing ECF Dkt. #13 at 581.

Again, while substantial evidence could support the opposite conclusion, the undersigned must recommend based upon the proper standard of review that substantial evidence supports the ALJ's consideration of Plaintiff's fatigue and his resulting physical RFC determination.

The undersigned recommends the same with regard to the ALJ's failure to include environmental restrictions for Plaintiff's COPD. The ALJ addressed the COPD as explained above and found that it was not a severe impairment. ECF Dkt. #13 at 21. He cited the many records indicating that Plaintiff's COPD was stable, cited to the fact that Plaintiff did not stop smoking even though she had this condition and was unable to undergo back surgery because of smoking, and he also found that the medical record contained no vocational limitations resulting from this condition.

-30-

*Id*. As such, the undersigned recommends that the Court find that the ALJ did not err in failing to include an environmental restriction in his RFC for Plaintiff and substantial evidence supports this determination.

### 2. MENTAL RFC

Plaintiff also asserts that the ALJ erred in not including any mental limitations in his RFC for Plaintiff. ECF Dkt. #14 at 17-19, 21-24. Specifically, Plaintiff contends that the ALJ should have included limitations to simple, repetitive work, no fast-paced work or strict production quotas, low stress work, and unskilled work with simple 1 to 3 step tasks as opposed to 1-3 step instructions. *Id*.

The ALJ addressed Plaintiff's various mental impairments, including her BIF, moderate major depressive disorder, generalized anxiety disorder and panic disorder with agoraphobia. ECF Dkt. #13 at 31-37. As to the BIF, the ALJ noted that even though no intellectual function testing had been performed, the medical evidence supported a finding of BIF. Id. at 32. He also reviewed the various evaluations and treatment notes from Plaintiff's psychiatric providers. *Id*. at 32-37.

In particular, the ALJ reviewed the mental RFC provided by agency reviewing psychologist Dr. Khan, who opined that despite her mental impairments, Plaintiff could perform one to three step tasks in a routine and predictable environment. ECF Dkt. #13 at 35, citing ECF Dkt. #13 at 561. The ALJ attributed considerable weight to this opinion. *Id*. While attributing such weight to this opinion, the ALJ did not explain why he declined to adopt Dr. Khan's routine and predictable work environment restriction in his mental RFC for Plaintiff.

The ALJ also reviewed one-time agency examining psychologist Dr. Tanley's assessment, who opined that Plaintiff had mild limitations in the area of understanding, remembering and following instructions, and in concentration, persistence or pace. ECF Dkt. #13 at 35, citing ECF Dkt. #13 at 539-541. Dr Tanley also opined that Plaintiff had no limitations in social interaction, but was markedly limited in withstanding the stress and pressures of daily work. ECF Dkt. #13 at 541. The ALJ explained that he attributed less weight to Dr. Tanley's assessment that Plaintiff had only mild limitations in concentration, persistence or pace as the medical evidence supported moderate limitations in these areas. *Id*. at 36. The ALJ explained that he found such moderate limitations because Plaintiff had some difficulty with serial three additions, recalling three objects after five

minutes and remembering digits forward and backward at the examination. *Id.* However, the ALJ fails to explain why such evidence supported moderate limitations when Dr. Tanley himself who conducted the test nevertheless found that Plaintiff had only mild limitations in the areas. *Id.* at 541. Dr. Tanley cited to Plaintiff's results on the testing and stated that "[c]oncentration, persistence, and pace were all mildly impaired as demonstrated by today's MSE results." *Id.*

Further, even if substantial evidence supports the ALJ's moderate limitations in concentration, persistence and pace and his explanation for such a finding, he nevertheless attributed no limitations in his mental RFC for Plaintiff based upon this limitation. The only mental limitation that the ALJ determined was a restriction to one to three step instructions.

The ALJ also found that the record failed to support Dr. Tanley's opinion that Plaintiff's symptom complex surrounding her panic attacks, combined with her bland affect, variable eye contact, appetite and sleep disturbance, mood problems, anhedonia and BIF markedly impaired her ability to withstand the stress and pressures of daily work. ECF Dkt. #13 at 541. The ALJ explained that the medical evidence did not show evidence of a history of decompensation, psychotic symptoms and suicidal ideation and Plaintiff was able to participate without significant difficulty in the on-time examination. *Id.* at 36. However, the ALJ's explanation fails to explain the significance of this finding and how review of these factors led him to conclude that Plaintiff was not so markedly impaired.

Further, even if substantial evidence supports the ALJ's decision to find that Plaintiff did not have marked limitations in withstanding the stress and pressures of daily work, he failed to indicate the degree of limitation, if any, that Plaintiff does have in withstanding the stress and pressures of daily life. And if the ALJ merely adopted the mental RFC of Dr. Khan in making this finding, as Dr. Khan found moderate limitations in Plaintiff's concentration, persistence and pace and gave little weight to Dr. Tanley's opinion regarding stress and pressures of daily work for the same reasons stated by the ALJ, the ALJ nevertheless failed to adopt Dr. Khan's mental RFC in full and failed to explain why he did not do so. As indicated, Dr. Khan opined that Plaintiff retained the capacity to learn and perform *simple* one to three step *tasks* in a *routine and predictable environment*. ECF Dkt. #13 at 561. The ALJ only found that Plaintiff retained the capacity to "remember and carry out one

to three step instructions." ECF Dkt. #13 at 25.

For these reasons, the undersigned recommends that the Court find that substantial evidence does not support the ALJ's mental RFC for Plaintiff in this case and his explanation for his findings is insufficient. Accordingly, the undersigned recommends that the Court remand the instant case for further evaluation and analysis of Plaintiff's mental RFC.

### C.      HYPOTHETICAL INDIVIDUALS AND VE TESTIMONY

Plaintiff also asserts various arguments concerning the ALJ's hypothetical individuals presented to the VE and the VE's testimony. ECF Dkt. #14 at 19-26. However, because the undersigned has recommended remand for reevaluation by the ALJ of Plaintiff's mental RFC, that reevaluation, if granted, may  impact the ALJ's subsequent steps in the sequential process. Accordingly, if the Court chooses to accept the undersigned's Report and Recommendation, the undersigned recommends that the Court decline to address these issues at the instant time because the ALJ's findings on remand may impact his findings relating to these later steps in the sequential process as well. *See Reynolds*, 424 Fed. App'x at 417.

### VIII.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court VACATE the decision of the ALJ and REMAND Plaintiff's case for reevaluation of Plaintiff's mental RFC.


DATE: July 18, 2014


                              ___*/s/George J. Limbert*_____
                              GEORGE J. LIMBERT
                              UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See, United States v. Walter,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985); and Local Rule 72.3